IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2011 JUL 18  AM 10:06
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
            DEPUTY

| | |
|---|---|
| EDDIE RODRIGUEZ, MILTON GERARD WASHINGTON, BRUCE ELFANT, BALAKUMAR PANDIAN, ALEX SERNA, SANDRA SERNA, BETTY F. LOPEZ, DAVID GONZALEZ, BEATRICE SALOMA, LIONOR SOROLA-POHLMAN, ELIZA ALVARADO, JUANITA VALDEZ-COX, JOSEY MARTINEZ, NINA JO BAKER, TRAVIS COUNTY, and CITY OF AUSTIN,<br><br>*Plaintiffs*,<br><br>vs.<br><br>RICK PERRY, in his official capacity as Governor of the State of Texas; DAVID DEWHURST, in his official capacity as Lieutenant Governor of the State of Texas; JOE STRAUS, in his official capacity as Speaker of the Texas House of Representatives; HOPE ANDRADÉ, in her official capacity as Secretary of State of the State of Texas; STATE OF TEXAS; BOYD RICHIE, in his official capacity as Chair of the Texas Democratic Party; and STEVE MUNISTERI, in his official capacity as Chair of the Republican Party of Texas,<br><br>*Defendants*. | No. 1:11-cv-00451-LY-JES-OLG |

**FIRST AMENDED COMPLAINT**

813971

## Introduction

1. In its first called special session, the 82nd Texas Legislature passed Senate Bill 4, redistricting Texas congressional districts. The new redistricting legislation—containing districts described in Plan C185 on the website of the Texas Legislative Council—becomes formally enacted law no later than July 20, 2011. Plaintiffs allege that Plan C185 violates rights guaranteed by the United States Constitution and federal statutes. Accordingly, plaintiffs seek a declaration that Plan C185's congressional districts are invalid and an injunction prohibiting defendants from calling, holding, supervising, or taking any action concerning primary or general elections for Texas members of the United States House of Representatives based on Plan C185.

## Parties

2. The following plaintiffs bring this suit in their personal capacities, as registered voters in the State of Texas:

   a. Eddie Rodriguez, who is Hispanic, resides at 1910 Haskell Street, Austin, Texas 78702, in current Congressional District ("CD") 25 and Plan C185's CD 35.

   b. Milton Gerard Washington, who is African-American, resides at 11500 Oak Trail, Austin, Texas 78753, in current CD 10 and Plan C185's CD 10.

   c. Bruce Elfant, who is Anglo, resides at 4522 Avenue F, Austin, Texas 78751, in current CD 25 and Plan C185's CD 10.

   d. Balakumar Pandian, who is Asian-American, resides at 2001 East 21st Street, Austin, Texas 78722, in current CD 25 and Plan C185's CD 25.

   e. Alex Serna and Sandra Serna, who are Hispanic, reside at 5448 La Estancia, El Paso, Texas 79932, in current CD 16 and Plan C185's CD 16.

f.  Betty F. Lopez, who is Hispanic, resides at 305 S. Nueces Street, San Antonio, Texas 78207, in current CD 20 and Plan C185's CD 35.

g.  David Gonzalez, who is Hispanic, resides at 618 Cobble Drive, San Antonio, Texas 78216, in current CD 21 and Plan C185's CD 20.

h.  Beatrice Saloma, who is Hispanic, resides at 277 West Wildwood Drive, San Antonio, Texas 78212, in current CD 20 and Plan C185's CD 20.

i.  Lionor Sorola-Pohlman, who is Hispanic, resides at 2314 Tannehill Drive, Houston, Texas 77008, in current CD 18 and Plan C185's CD 2.

j.  Eliza Alvarado, who is Hispanic, resides at 1306 W. Kiwi, #4, Pharr, Texas 78577, in current CD 15 and Plan C185's CD 15.

k.  Juanita Valdez-Cox, who is Hispanic, resides at 302 N. Valley View, Donna, Texas 78537, in current CD 15 and Plan C185's CD 34.

l.  Josey Martinez, who is Hispanic, resides at 317 East Drew Street, Fort Worth, Texas 76110, in current CD 12 and Plan C185's CD 26.

m.  Nina Jo Baker, who is African-American, resides at 1002 East 2nd Street, Fort Worth, Texas 76102, in current CD 12 and Plan C185's CD 26.

3.  Plaintiff Travis County, a political subdivision of the State of Texas under Article I, Section 1, of the Texas Constitution, is charged by the Texas Legislature with principal local responsibility for the conduct of elections, including elections for congressional office. *See, e.g.*, Tex. Elec. Code, ch. 31, subch. B & ch. 32, subch. A. Under Section 42.001(a) of the Election Code, the County's Commissioners Court is responsible for establishing election precincts within its territory and, in redistricting years, is directed in Section 42.032 of the Election Code to complete the process by October 1st. As a geographically compact and contiguous political

subdivision with many residents sharing similar concerns, and with a population of 1,024,266 under the 2010 census, 325,778 people in excess of the ideal population size for a congressional district, Travis County forms a distinct community of interest under traditional districting principles.

4. Plaintiff the City of Austin, a political subdivision of the State of Texas, is a home rule municipality under Article XI, Section 5, of the Texas Constitution, with full power of local self-government under Texas Local Government Code § 51.072(a), and is authorized by Article I, § 3, of its charter to take such actions as its governing body deems necessary to advance the interests of its residents. As a geographically compact and contiguous political subdivision with many residents sharing similar concerns, and with a population of 790,390 under the 2010 census, 91,902 people in excess of the ideal population size for a congressional district, Austin forms a distinct community of interest under traditional districting principles.

5. Defendants are the Governor of Texas, the Lieutenant Governor of Texas, the Speaker of the Texas House of Representatives, the Secretary of State of Texas, the State of Texas itself, the Chair of the Texas Democratic Party, and the Chair of the Republican Party of Texas. All of the defendant officials are sued in their official capacity only. The residences of the state officials, in their official capacity, are all in Travis County, as the seat of government of the State of Texas is in the City of Austin. *See* Tex. Const. art. III, § 58. All the defendants, through their counsel, have entered appearances in this case.

## Jurisdiction and venue

6. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 1357, 2201, 2202, and 2284. Venue is proper in this district under 28 U.S.C. § 1391(b) and in this division under 28 U.S.C. § 124(d)(1).

813971

**Factual background**

7.  The currently operative congressional districting plan for Texas, containing thirty-two districts, is known as Plan C100. It has been in effect since an order issued on August 4, 2006, by the United States District Court for the Eastern District of Texas in *LULAC v. Perry*, No. 2:03CV158. It has three districts—CDs 9, 18, and 30—that the state has classified as African-American opportunity districts within the meaning of Section 2 of the Voting Rights Act of 1965, as amended ("VRA"), 42 U.S.C. § 1973 (generally referred to as "Section 2"). It also has seven districts—CDs 15, 16, 20, 23, 27, 28, and 29—that the state has classified as Hispanic opportunity districts under Section 2 of the VRA. One of these districts is in Harris County. The other six are in an arc generally running from El Paso, along the Rio Grande River to Brownsville, up to Corpus Christi, and over to San Antonio (termed elsewhere in this pleading the "Texas Border Region").

8.  Pursuant to 2 U.S.C. § 2a(a), the President of the United States is required, every ten years, to transmit to the Congress "the number of persons in each State" and "the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives."

9.  The official results of the 2010 census were released on December 21, 2010. On January 5, 2011, the President of the United States, pursuant to 2 U.S.C. § 2a(a), transmitted to Congress a statement showing the population of each of the fifty states, including the defendant State of Texas, as reported in the 2010 census. These population figures show that the State of Texas contains 25,145,561 persons and is now entitled to 36 congressional representatives, an increase of four since the reapportionment after the 2000 census.

10. Texas's total population growth in the decade between the 2000 census and the 2010 census was 4,293,741. Of these additional residents: 2,791,255 were Hispanic; 522,570 were African-American; 464,032 were Anglo; and 401,144 were Asian-American. These tabulations mean that: Hispanics accounted for 65.0% of the state's growth; African-Americans for 12.2%; Anglos for 10.8%; and Asian-Americans for 9.3%. Anglos are now 45.3% of the state's population; Hispanics, 37.6%; African-Americans, 11.5%; and Asian-Americans, 3.8%. According to calculations of the Texas Legislative Council, Hispanics account for approximately 24.7 % of the citizen voting age population of the state.

11. As required by the Texas Constitution, the 82nd Texas Legislature convened in regular session on January 11, 2011. On or about February 17, 2011, the Governor and the Texas Legislature received the official 2010 census population numbers for the State of Texas, sufficient to perform the task of congressional redistricting during the now-concluded regular legislative session. The legislature adjourned its regular session *sine die* on May 30, 2011, without enacting a new congressional redistricting plan.

12. The Governor called a special session of the 82nd Texas Legislature and included congressional redistricting as an item in the special session call. The special session convened on May 31, 2011, and adjourned *sine die* on June 29, 2011.

13. Legislation establishing new congressional district lines—known as Senate Bill 4—was passed during the first called special session of the 82nd Texas Legislature. Article II of Senate Bill 4 established a redistricting plan—designated Plan C185—for Texas congressional seats. This redistricting plan is designed to cover primary and general elections to federal congressional seats beginning with the 113th United States Congress, which will convene in January 2013. These elections commence with March 2012 party primaries.

813971

14. The Governor will have allowed Senate Bill 4 to become law by not acting on it by the end of the day on July 19th. Plan C185 did not receive a two-thirds favorable vote in both houses of the Texas Legislature. Therefore, under state law, while the bill will become a formal enactment by July 20th, it is not effective until September 28, 2011. *See* Senate Bill 4, Art. III, § 5. This effective date is a month later than the new redistricting plans for the Texas Senate, the Texas House, and the Texas Board of Education, all of which were passed in the regular session of the 82nd Texas Legislature and become effective on August 29, 2011.

15. The State of Texas is a covered jurisdiction under Section 5 of the VRA, 42 U.S.C. § 1973c (generally referred to as "Section 5"). Therefore, as a matter of federal law, the state's Plan C185 cannot be implemented until it has received preclearance as required under the VRA's Section 5. To date, the State has neither submitted Plan C185 for Section 5 preclearance, nor received preclearance, and, therefore, it has no authority to implement the plan.

16. Until the later of Plan C185's state law effective date of September 28, 2011, or preclearance under Section 5, Plan C100 remains the only operative plan for congressional districts in Texas.

17. At this point, the only operative state plan, Plan C100, does not accommodate the four new congressional seats apportioned to Texas. Additionally, many districts in Plan C100 are overpopulated, including CDs 10, 12, 15, 16, 18, 20, 21, and 25, with deviations from the ideal population for Texas congressional districts under the 2010 census ranging from a low of 1.88 % to a high of 40.5 %.

18. As enacted, Plan C185 fails to satisfy the requirements of the VRA's Section 2 in at least four particulars:

a. In the Tarrant County-Dallas County area, a congressional district could have been formed that would have contained a reasonably compact population of Hispanics who are citizens and of voting age who would constitute at least 50% of the citizen voting age population of the district. In this area, the Hispanic voters are politically cohesive and the majority Anglo voters vote sufficiently as a bloc to enable them, in the absence of special circumstances, usually to defeat the preferred candidate of the Hispanic voters. These facts coexist with other circumstances in the area—including a history of official discrimination with respect to the opportunity of Hispanics to exercise the right to vote, a lack of responsiveness on the part of elected officials to the particularized needs of Hispanics, and the tenuous nature of the justification for the congressional district lines drawn in the area—to provide a less than equal opportunity for the Hispanics there to participate in the political process and to elect congressional representatives of their choice.

b. In the Tarrant County-Dallas County area, a congressional district could have been formed that would have contained a reasonably compact population of African-Americans who are citizens and of voting age who, together with the Hispanic population in the area, would constitute at least 50% of the citizen voting age population of the district. In this area, the African-American voters are politically cohesive amongst themselves and with Hispanic voters and the majority Anglo voters vote sufficiently as a bloc to enable them, in the absence of special circumstances, usually to defeat the preferred candidate of the African-American voters. These facts coexist with other circumstances in the area—including a history of official discrimination with respect to the opportunity of African-Americans to exercise the

813971

right to vote, a lack of responsiveness on the part of elected officials to the particularized needs of African-Americans, and the tenuous nature of the justification for the congressional district lines drawn in the area—to provide a less than equal opportunity for the African-Americans there to participate in the political process and to elect congressional representatives of their choice.

c.   In the Texas Border Region, another congressional district could have been formed, and solidly anchored there, that would have contained a reasonably compact population of Hispanics who are citizens and of voting age who would constitute at least 50% of the citizen voting age population of the district. In this area, the Hispanic voters are politically cohesive and the majority Anglo voters vote sufficiently as a bloc to enable them, in the absence of special circumstances, usually to defeat the preferred candidate of the Hispanic voters. These facts coexist with other circumstances in the area— including a history of official discrimination with respect to the opportunity of Hispanics to exercise the right to vote, a lack of responsiveness on the part of elected officials to the particularized needs of Hispanics, and the tenuous nature of the justification for the congressional district lines drawn in the area—to provide a less than equal opportunity for the Hispanics there to participate in the political process and to elect congressional representatives of their choice.

d.   In Harris County, an additional congressional district—besides CD 29—could have been formed that would have contained a reasonably compact population of Hispanics who are of voting age who would constitute 60% of the voting age population of the district. In this area, the Hispanic voters are politically cohesive and the majority Anglo voters vote sufficiently as a bloc to enable them, in the absence of special

circumstances, usually to defeat the preferred candidate of the Hispanic voters. Moreover, in this area the preferred candidates of these Hispanic voters receive sufficient cross-over support from African-American voters to allow Hispanic voters effectively to elect the candidate of their choice. These facts coexist with other circumstances in the area—including a history of official discrimination with respect to the opportunity of Hispanics to exercise the right to vote, a lack of responsiveness on the part of elected officials to the particularized needs of Hispanics, and the tenuous nature of the justification for the congressional district lines drawn in the area—to provide a less than equal opportunity for the Hispanics there to participate in the political process and to elect congressional representatives of their choice.

21. Many other aspects of Plan C185 also violate federal law, as detailed below.

22. Despite Travis County having sufficient population for its own congressional district (with additional population for another half congressional district), Plan C185 divides Travis County into five congressional districts—CDs 10, 17, 21, 25, and 35—none of which takes anywhere close to a majority of its voters from Travis County or encompasses anywhere close to a majority of the county's population. Most of the population of the City of Austin is located in Travis County; Austin, too, insofar as it is in Travis County, is divided into the same five congressional districts, none anchored in the city. (A part of Austin in Williamson County is in a sixth congressional district, CD 31.) Texas has eight counties with populations in excess of the ideal size of a congressional district, and Travis County is the only one of those counties without at least one congressional district firmly anchored in it under Plan C185.

813971

23. Only 35.0 % of CD 10's population is in Travis County; 19.1 % of CD 17's; 27.1 % of CD 21's; 34.6 % of CD 25's; and 30.9 % of CD 35's. All of these districts, except CD 35, have an overwhelming preponderance of Anglo population.

24. The voting age population of Travis County currently is 55.2% Anglo, 29.3% Hispanic, and 7.8% African-American. For the City of Austin, the current voting age population is 53.6% Anglo, 30.6% Hispanic, and 7.5% African-American. Notwithstanding this predominance of Anglo voters, Travis County and the City of Austin have been the locus of a longstanding tri-ethnic coalition of voters in which racially polarized voting has proven legally insignificant and there has been a high level of cross-over voting by Anglo voters to support the candidate of choice of minority voters, both Hispanic and African-American, so that those preferred candidates regularly find success at the polls. In the late 1980s, the Fifth Circuit addressed a VRA Section 2 challenge to at-large elections in the City of Austin and concluded that the facts demonstrated that the city "has repeatedly elected black and Mexican-American council members during the past 17 years." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989). The appeals court further determined that "the winning minority candidates frequently received well over fifty percent (50%) of the Anglo vote and were also the preferred candidate of minorities." *Id*. The court further concluded: "Minority candidates have routinely been elected to other posts in Austin and the surrounding Travis County." *Id*. A half decade later, the Fifth Circuit, sitting *en banc*, reached the same conclusion about Anglo cross-over voting in Travis County, finding that "the undisputed facts indicate that Travis County's political system is open to Hispanic and white candidates alike." *LULAC v. Clements*, 999 F.2d 831, 888 (5th Cir. 1993), *cert. denied*, 510 U.S. 1071 (1994). From this and other facts detailed in the opinion, the court characterized the evidence in the VRA Section 2 challenge to at-large elections (for judgeships)

11

in Travis County as "minimal" and "plainly insufficient to prove illegal vote dilution." *Id.* The part of the current CD 25 in Plan C100 that is in Travis County encompasses the core areas of this longstanding tri-ethnic voting coalition.

25. The preferred candidates of minority voters in Travis County and the City of Austin have regularly had success in winning county-wide and city-wide elections with the support of large cross-over voting by Anglos. Gustavo "Gus" Garcia was elected Austin's mayor in 2001. There currently are fourteen officials who were elected in either county- or city-wide elections who are minorities; seven are African-American, and seven are Hispanic. Cheryl Cole, who is African-American, and Mike Martinez, who is Hispanic, both currently serve on the Austin city council, having won city-wide elections. The current Travis County Judge, Samuel T. Biscoe, and Travis County Sheriff, Greg Hamilton, are African-Americans who won county-wide elections. The current Travis County Attorney, David Escamilla, and Travis County District Clerk, Amalia Rodriguez-Mendoza, are Hispanics who won county-wide elections. The current roster of district and county court at law judges of Travis County, all elected in county-wide elections, includes four African-Americans and four Hispanics.

26. The current district primarily anchored in Travis County is CD 25 (under the court-drawn Plan C100). Sixty percent of its population is in the county, and that part of the district embraces a large component of the county's tri-ethnic coalition. The most recent, legally drawn congressional district (before Plan C100's CD 25) which was primarily anchored in Travis County was CD 10, which was court-drawn in 2001. It was even more firmly anchored in Travis County and embraced an even larger component of the tri-ethnic voting population.

27. During the 2011 redistricting process, the Texas Legislature was fully aware of this historic backdrop and had evidence of the presence of high-levels of Anglo cross-over voting in

Travis County-based elections. It also had proposed maps before it demonstrating that additional, viable Hispanic opportunity districts could have been created in the Central and South Texas area without disrupting the longstanding tri-ethnic coalition of voters in Travis County and the City of Austin. Yet in the face of this evidence and the background findings of the last two decades, and without being presented any evidence disputing the demonstrated pattern of highly significant Anglo cross-over voting during the past two decades in Travis County, the Texas Legislature made a deliberate, purposeful choice to divide the county and city in such a way that the tri-ethnic coalition was fragmented so that it could not operate in congressional elections. The Legislature took this step in the absence of any legal necessity. And it divided the coalition so that minority voters in Travis County, both Hispanic and African-American, could no longer join with Anglo voters crossing over in large numbers so that the preferred candidates of the minority voters could find success in the congressional elections.

28. The Texas Legislature engaged in additional acts of line-drawing in Plan C185 that were purposeful and race-based, directed at diminishing the voting power of minority voters in the state. Statewide, the legislature engaged in conscious racial gerrymandering by fragmenting essentially all significant enclaves of the minority voting community, other than in districts considered minority opportunity districts, and submerging them in overwhelmingly Anglo districts to ensure that, outside minority opportunity districts, minority votes in congressional elections would be rendered ineffective by preventing the formation of coalitions of voters capable of electing the preferred candidates of minority voters or of having any meaningful impact in congressional elections. Examples of such deliberate actions include:

    a.   In Plan C185's CD 27, the legislature isolated the Hispanic voting community in Nueces County, which is 60.6 Hispanic, in an overwhelmingly Anglo district stretching to

813971

the outskirts of Travis County. This action was intended to sever the large Hispanic voting community of Nueces County from other significant groups of Hispanic voters in the Texas Border Region to keep from forming an additional Hispanic opportunity district.

b.   In Tarrant County, Plan C185 fragments Hispanic and African-American communities by dividing them from one another, thereby preventing the formation of minority voting coalitions, and relegating them to separate, overwhelmingly Anglo districts such as CDs 12, 26, and 33.

c.   In Travis County, Plan C185 fragments the historic core as well as the more recently formed core of the African-American community among three overwhelmingly Anglo districts, CDs 25, 17, and 10.

29. The Legislature further engaged in intentional discrimination on the basis of race by designing Plan C185 to try to entrench racial divisions along partisan lines for the next decade. Under Plan C185, every Anglo-majority district is designed to be a Republican district, while every district designed to be Democratic is also a minority-opportunity district. This legislative design is a building block in an intentional effort to dilute the overall influence of minority voters in Texas congressional elections.

### Causes of action

*Count 1: VRA Section 2*

30. The facts alleged herein constitute a denial or abridgement of the plaintiffs' right to vote for their representative to the United States House of Representatives, in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

813971

*Count 2: Equal protection*

31. The facts alleged herein constitute a denial to the plaintiffs of rights guaranteed by the Equal Protection Clause of Section 1 of the Fourteenth Amendment to the United States Constitution.

*Count 3: Constitutional right to vote*

32. The facts alleged herein constitute a deprivation of the plaintiffs' rights under the Fifteenth Amendment to the United States Constitution.

*Count 4: One person, one vote*

33. The facts alleged herein constitute a deprivation of the plaintiffs' rights under Article I, Section 2, of the United States Constitution.

*Count 5: Section 5 injunction*

34. The facts alleged herein establish that, until Senate Bill 4 has received preclearance, any effort by the state defendants to implement any aspect of the legislation violates plaintiffs' rights under Section 5 of the VRA, 42 U.S.C. § 1973c.

**Prayer for relief**

35. Based upon the foregoing matters, the plaintiffs pray that this Court:

a. Assume jurisdiction over this action as a three-judge District Court pursuant to 28 U.S.C. § 2284;

b. Enter a declaratory judgment that the Texas congressional districts in Plan C185 violate the plaintiffs' rights under the United States Constitution and federal law, as alleged under ¶¶ 30-32, above;

813971

c. Enter a declaratory judgment that the Texas congressional districts in Plan C100 violate the plaintiffs' rights under the United States Constitution, as alleged in ¶ 33, above;

d. Grant plaintiffs appropriate injunctive relief enjoining the defendants, their officers, agents, employees, attorneys, successors in office, and all persons in active concert or participation with them, from any implementation or use of Plan C185 in primary and general elections until and unless:

(1) Plan C185 is precleared as required by 42 U.S.C. § 1973c; and

(2) The legal violations found with respect to Plan C185, either under 42 U.S.C. § 1973c or in this lawsuit, are remedied by the Texas Legislature by a date certain or by this Court.

e. Grant plaintiffs appropriate injunctive relief enjoining the defendants, their officers, agents, employees, attorneys, successors in office, and all persons in active concert or participation with them, from any further implementation or use of Plan C100 in primary and general elections;

f. Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid congressional redistricting plan for the State of Texas for use during the 2012 elections;

g. Grant the plaintiffs their reasonable attorney fees, litigation expenses, and costs in maintaining this action; and

h. Grant the plaintiffs such further relief as may be necessary, appropriate, and equitable.

813971

Respectfully submitted,

Renea Hicks
Attorney at Law
State Bar No. 09580400
Law Office of Max Renea Hicks
101 West 6th Street
Austin, Texas 78701
(512) 480-8231
fax (512) 480-9105
e-mail: rhicks@renea-hicks.com

**SCOTT, DOUGLASS & MCCONNICO, L.L.P.**

BY: /s/ Steve McConnico
Steve McConnico
State Bar No. 13450300
smcconnico@scottdoug.com
S. Abraham Kuczaj, III
State Bar No. 24046249
akuczaj@scottdoug.com
Sam Johnson
State Bar No. 10790600
sjohnson@scottdoug.com
600 Congress Avenue, Suite 1500
Austin, Texas 78701-2589
(512) 495-6300
fax (512) 474-0731

Attorneys for Plaintiffs Eddie Rodriguez, *et al.*, Travis County, and City of Austin

David Escamilla
Travis County Attorney
State Bar No. 06662300
P.O. Box 1748
Austin, Texas 78767
(512) 854-9416
fax (512) 854-4808

Attorney for Plaintiff Travis County

813971

        Karen Kennard
        City Attorney
        State Bar No. 11280700
        P.O. Box 1088
        Austin, Texas 78767-1088
        (512) 974-2268
        fax (512) 974-6490

        Attorney for Plaintiff City of Austin

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of July, 2011, I the foregoing document was served by hand-delivery and/or facsimile to the following:

*Attorney for Defendants Gov. Rick Perry,*
*Lt. Gov. David Dewhurst, Speaker Joe Straus,*
*Secretary of State Hope Andradé, and*
*the State Of Texas*
David Schenck, Deputy Attorney General
for Legal Counsel                           *Fax: 512-936-0545*
209 W 14th Street
Austin, TX 78711

*Attorney for Defendant Chair of the*
*Texas Democratic Party Boyd L. Richie*
Chad W. Dunn                                           *Fax: 281-580-6362*
4201 FM 1960 West, Suite 530
Houston, TX 77068

*Attorney for Defendant Chair of the*
*Republican Party of Texas Steve Munisteri*
Donna Garcia Davidson                          *Fax: 877-200-6001*
P.O. Box 12131
Austin, TX 78711-2131

                                                                  */s/ Steve McConnico*
                                                                  Steve McConnico

813971